1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,          )
                                   )          Case No. 2:14-cr-00328-KJD-NJK
                    Plaintiff,     )
                                   )          ORDER AND
vs.                                )          REPORT &  RECOMMENDATION
                                   )
GLEN HUNSBERGER, et al.,           )
                                   )          (Docket Nos. 57, 61)
                    Defendants.    )
_____)

Pending before the Court is Defendant Manuelle Alkeine's Motion to Suppress, filed on February 26, 2015.  Docket No. 57.  On March 11, 2015, the United States filed a response.  Docket No. 58.  On April 3, 2015, Defendant Glen Hunsberger filed a motion for joinder to Defendant Alkeine's motion.  Docket No. 62.  On April 6, 2015, the Court granted Defendant Hunsberger's motion for joinder.  Docket No. 64.  No reply was filed.  *See* Docket.

Also pending before the Court is Defendant Jennifer Peskett's Motion to Suppress Evidence for Fourth Amendment Violations (Evidentiary & Franks Hearing Requested), filed on April 3, 2015.  Docket No. 61.  On April 3, 2015, Defendant Hunsberger filed a motion for joinder to Defendant Peskett's motion.  Docket No. 63.  On April 6, 2015, the Court granted Defendant Hunsberger's motion for joinder.  Docket No. 64.  On April 13, 2015, the United States filed a response to Defendant Peskett's motion.  Docket No. 70.  On April 20, 2015, Defendant Hunsberger filed a reply to the United States' response and, on April 24, 2015, Defendant Peskett filed a reply to the United States' response.  Docket Nos. 71, 72.

On March 20, 2015, the Court set an evidentiary hearing for April 21, 2015, on Defendant Alkeine's motion.  Docket No. 59.  On April 6, 2015, the Court set an evidentiary hearing on Defendant Peskett's motion at the same time as Defendant Alkeine's motion and granted Defendant

Hunsberger's motions for joinder.  Docket No. 64.  On April 7, 2015, Defendant Alkeine filed a motion to continue the evidentiary hearing.  Docket No. 65.  The same day, the Court granted Defendant Alkeine's motion, vacated the hearing, and ordered the parties to file a stipulation containing three dates on which all required participants in the hearing were available.  Docket No. 66.  On April 9, 2015, the parties filed a stipulation containing available dates and, the next day, the Court continued the hearing until May 11, 2015.  Docket Nos. 67, 68.  On May 11, 2015, at the parties' request, the Court continued the evidentiary hearing to August 3, 2015.  Docket No. 76.

This action was referred to the undersigned magistrate judge for a report of findings and recommendation pursuant to 28 U.S.C. 636(b)(1)(B) and Local Rule IB 1-4.  On August 3, 2015, the Court held an evidentiary hearing on Defendants' motions.  Docket No. 87.  The Court has considered Defendant Alkeine's Motion, the United States' Response, Defendant Hunsberger's Joinder, Defendant Peskett's Motion, Defendant Hunsberger's Joinder, the United States' Response, Defendant Peskett's Reply, Defendant Hunsberger's Reply, the evidence adduced at the evidentiary hearing on this matter, and the parties' arguments.  Docket Nos. 57, 58, 62, 61, 63, 70, 71, 72, 87.[1]

## I.  **BACKGROUND**

The three defendants are charged with one count of conspiracy to distribute Heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B) and Title 21, United States Code, Section 846.  Docket No. 14.  The portion of the case at issue in the motions pending before the Court revolve around a total of five packages that were placed in the United States mail.  Docket No. 58, at 1-2.[2]

Package 1 carries Express Mail label EI523533372US and, according to the label on the package, was mailed on July 30, 2013 at 12:34 p.m. by Jay Brown, 12328 Miller Rd, Sterling, OH 44726 to Jennifer Peskett, 4400 Jones Blvd # 3086, Las Vegas, NV 89103.  *Id*., at 2.  Package 2 carries Express Mail label EI523536507US and, according to the label on the package, was mailed

---

[1]Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing, as no written transcript has been prepared.

[2]The United States has referred to the packages chronologically by date and time mailed and location seized and has, therefore, labeled them as packages 1-5.  *See, e.g.*, Docket No. 58, at 2.  For ease of identification, the Court adopts this manner of labeling.

on July 30, 2013 at 1:18 p.m. by Jay Brown, 10158 Angling Rd, Wooster, OH 44691 to Executive Entertainment Mgmt Group, 5420 West Sahara, Unit 101, Las Vegas, NV 89146. *Id*. Package 3 carries Express Mail label EI523536498US and, according to the label on the package, was mailed on July 30, 2013 at 12:02 p.m. by Jay Brown, 1340 Andrus St, Akron, OH 44301 to Manny Alkeine, 2747 Paradise Road, Unit 2106, Las Vegas, NV 89109. *Id*. Package 4 carries Express Mail label EI523536484US and, according to the label on the package, was mailed on July 30, 2013 at 1:30 p.m. by Jay Brown, 1573 Smart Rd, Lucas, OH 44843 to Kyla's Cachet, 3230 Polaris Ave #9, Las Vegas, NV 89146. *Id*. Package 5 carries Express Mail label EK96528304US and, according to the label on the package, was mailed on July 30, 2013 at 3:00 p.m. by Jay Brown, 2663 Bristol Road, Columbus, OH 43221 to Jennifer Peskett, 4400 Jones Blvd #3086, Las Vegas, NV 89103. *Id*. On each package, the sender's phone number was listed as (330) 231-9293. *Id*.

## A.     Search Warrant for Package 1

On July 31, 2013, United States Magistrate Judge Gregory A. White in Cleveland, Ohio issued a search warrant for Package 1. Docket No. 61-1 at 2. The affidavit in support of that search warrant, sworn to by United States Postal Inspector (PI) Marc A. Kudley, stated in part that PI Kudley has received training in the detection and investigation of prohibited mailing offenses. *Id*., at 5. PI Kudley further stated that U.S. Mail is "often used by narcotics traffickers to transport controlled substances, as well as U.S. currency derived from the distribution of controlled substances, either as payment or proceeds." *Id*. PI Kudley stated that U.S. Postal Service Express Mail is "commonly used to transport controlled substances because narcotic traffickers can track the parcels, control dispatch times and locations, and have a guarantee of delivery in one business day." *Id*. PI Kudley knows that people who use the mail to transport controlled substances and/or proceeds of controlled substances "will often place fictitious address and/or name information on these parcels, particularly on the return address, to conceal their true identities from law enforcement should the parcel be seized." *Id*.

PI Kudley further states in the affidavit in support of the search warrant for Package 1 that, on July 30, 2013, another Postal Inspector identified Package 1, which was mailed from the Seville, Ohio post office. *Id*. PI Kudley conducted inquiries and was unable to associate the name Jay

Brown with the return address or the name Jennifer Peskett with the delivery address.  *Id*.  On July 30, 2013, Package 1 was subjected to Daisy, a narcotic detection canine handled by Officer Patrick Andrejcak of the Cleveland Police Department Canine Unit.  *Id*.[3]  Daisy gave a positive alert on Package 1 which, according to Officer Andrejcak, meant that Daisy detected the odor of an illegal drug emanating from the parcel.  *Id*.[4]  PI Kudley submitted that he knew that people who regularly handle controlled substances "often leave the scent of controlled substances, which narcotic canines are trained to indicate alert, on the box, contents of the box, and/or other packaging material they handle."  *Id*., at 6.

Finally, PI Kudley asserted that Nevada is a common origination area, and Northern Ohio is a common destination point, for controlled substances sent through the U.S. mail.  *Id*.  He also stated that Nevada is a common destination point for narcotic proceeds and that Express Mail is a "method used for mailing these proceeds."  *Id*.

After Judge White issued the search warrant and PI Kudley searched Package 1, PI Kudley completed an inventory return.  *Id*., at 3.  The return showed that PI Kudley found $15,000 in United States currency in a vaccum-sealed food saver bag inside a Sony DVD player with its hardware removed and the DVD player box inside the parcel.  *Id*.

**B.**      **Search Warrant for Package 2**

On August 1, 2013, Judge White issued a search warrant for Package 2.  Hearing Exhibit 2. The affidavit in support of that search warrant, sworn to by PI Kudley, stated in part that PI Kudley has received training in the detection and investigation of prohibited mailing offenses.  *Id*.  PI Kudley further stated that U.S. Mail is "often used by narcotics traffickers to transport controlled substances, as well as U.S. currency derived from the distribution of controlled substances, either as payment or proceeds."  *Id*.  PI Kudley stated that U.S. Postal Service Express Mail is "commonly used to

---

[3]This law enforcement officer testified at the evidentiary hearing that he is a detective, not an officer; however, the affidavit calls him officer.  Docket No. 61-1 at 5-6.  Therefore, when discussing the facts in the affidavit, the Court refers to him as Officer rather than Detective.

[4]The affidavit also discusses Daisy and her handler's certification and training.  *Id*., at 6. Since Detective Andrejcak testified at length about certification and training, the Court discusses both in the section regarding Detective Andrejcak's testimony.

transport controlled substances because narcotic traffickers can track the parcels, control dispatch times and locations, and have a guarantee of delivery in one business day." *Id.*  PI Kudley knows that people who use the mail to transport controlled substances and/or proceeds of controlled substances "will often place fictitious address and/or name information on these parcels, particularly on the return address, to conceal their true identities from law enforcement should the parcel be seized." *Id.*

PI Kudley further states in the affidavit in support of the search warrant for Package 2 that, on July 30, 2013, another Postal Inspector identified Package 1, which was mailed from the Seville, Ohio post office. *Id.*  PI Kudley obtained a federal search warrant for Package 1 and, upon executing the search warrant, found $15,000 in United States currency concealed in a vacuum-sealed food saver bag, a Sony DVD player and a Sony DVD box. *Id.*

On July 30, 2013, the same Postal Inspector who identified Package 1 also identified Package 2, which was mailed from the Jeromesville, Ohio post office. *Id.*  PI Kudley stated that Packages 1 and 2 are related, based on the facts that the sender's name and phone number on both parcels are the same, as well as the postage amount, weight and destination of both parcels.  Additionally, PI Kudley represented that the handwriting on the two parcels is similar. *Id.*  PI Kudley conducted inquiries and was unable to associate the name Jay Brown with the return address or the name Executive Entertainment Mgmt Group with the delivery address. *Id.*

On July 30, 2013, Package 2 was subjected to Daisy, a narcotic detection canine handled by Officer Patrick Andrejcak of the Cleveland Police Department Canine Unit. *Id.*[5]  Daisy gave a positive alert on Package 1 which, according to Officer Andrejcak, meant that Daisy detected the odor of an illegal drug emanating from the parcel. *Id.*[6]  PI Kudley submitted that he knew that people who regularly handle controlled substances "often leave the scent of controlled substances, which

---

[5]This law enforcement officer testified at the evidentiary hearing that he is a detective, not an officer; however, this affidavit, like the affidavit for Package 1, calls him officer. Hearing Exhibit 2.  Therefore, when discussing the facts in the affidavit, the Court refers to him as Officer rather than Detective.

[6]This affidavit, like the one for Package 1, also discusses Daisy and her handler's certification and training. *Id.*  As with Package 1, since Detective Andrejcak testified at length about certification and training, the Court discusses both in the section regarding Detective Andrejcak's testimony.

1    narcotic canines are trained to indicate alert, on the box, contents of the box, and/or other packaging

2    material they handle." *Id*., at 6.

3         Finally, PI Kudley asserted that Nevada is a common origination area, and Northern Ohio

4    is a common destination point, for controlled substances sent through the U.S. mail. *Id*.  He also

5    stated that Nevada is a common destination point for narcotic proceeds and that Express Mail is a

6    "method used for mailing these proceeds." *Id*.

7         After Judge White issued the search warrant and PI Kudley searched Package 2, PI Kudley

8    completed an inventory return. *Id*..  The return showed that PI Kudley found $15,000 in United

9    States currency in a vaccum-sealed food saver bag inside a Sony DVD player with its hardware

10   removed and the DVD player box inside the parcel. *Id*.

11   **C.     Search Warrants for Packages 3, 4 and 5**

12        On August 2, 2013, United States Magistrate Judge C.W. Hoffman in the District of Nevada

13   issued search warrants for Packages 3, 4 and 5.  Hearing Exhibit 3B (Package 3); Hearing Exhibit

14   4 (Package 4); Docket No. 61-2, at 2 (Package 5).  The same affidavit, sworn to by United States

15   Postal Inspector (PI) Daniel Carbonetti, supported the issuance of all three search warrants.  Docket

16   No. 61-2, at 11-23.

17        PI Carbonetti described Package 3 (identified in the affidavit as **SUBJECT PARCEL #1**)

18   as a white parcel box, weighing approximately 4 pounds, 6 ounces, and measuring approximately

19   14"x12"x4".  *Id*., at 12.  He stated that the parcel bore a handwritten Express Mail Label, listed the

20   label's Express Mail number, as well as both addresses on the label, and that the parcel was affixed

21   with $39.95 in postage.  *Id*.  Finally, PI Carbonetti stated that Package 3 was postmarked July 30,

22   2013, and was mailed from Akron, Ohio.  *Id*., at 12-13.

23        PI Carbonetti described Package 4 (identified in the affidavit as **SUBJECT PARCEL #2**)

24   as a white parcel box, weighing approximately 4 pounds, 6 ounces, and measuring approximately

25   14"x12"x4".  *Id*., at 13.  He stated that the parcel bore a handwritten Express Mail Label, listed the

26   label's Express Mail number, as well as both addresses on the label, and that the parcel was affixed

27   with $39.95 in postage.  *Id*.  Finally, PI Carbonetti stated that Package 4 was postmarked July 30,

28   2013, and was mailed from Hayesville, Ohio.  *Id*.

1   PI Carbonetti described Package 5 (identified in the affidavit as **SUBJECT PARCEL #3**)

2   as a white parcel box, weighing approximately 4 pounds, 6 ounces, and measuring approximately

3   14"x12"x4". *Id*. He stated that the parcel bore a handwritten Express Mail Label, listed the label's

4   Express Mail number, as well as both addresses on the label, and that the parcel was affixed with

5   $39.95 in postage. *Id*. Finally, PI Carbonetti stated that Package 5 was postmarked July 30, 2013,

6   and was mailed from Columbus, Ohio. *Id*.

7   PI Carbonetti stated that experience and intelligence gathered by the U.S. Postal Inspection

8   Service (USPIS) have shown Express Mail and Priority Mail "are frequently utilized by drug

9   traffickers for shipping controlled substances or proceeds/payments." *Id*. He also indicated the

10   reasons for this utilization, including speed, reliability, and free package tracking service. *Id*. PI

11   Carbonetti stated that the USPIS has established interdiction programs in cities that have been

12   identified as known sources of controlled substances throughout the United States. *Id*., at 14.

13   Further, the USPIS has analyzed packages mailed through its overnight and two-day delivery

14   services that have been found to contain controlled substances or proceeds/payments of sales of

15   controlled substances, and has noted certain common characteristics. *Id*. The USPIS has found that

16   the labels on these packages are usually written as though the package is being sent from an

17   individual to an individual and, when a business or company name is used, it usually is a fictitious

18   name. *Id*. In addition, the analysis found a series of characteristics that, when present in a

19   combination of two or more on a certain package, indicate a high probability that the package will

20   contain a controlled substance or proceeds of controlled substance sales. *Id*. PI Carbonetti submits

21   that the characteristics are:

22          a package mailed from or addressed to a narcotic source city; the package has a
             fictitious return address; the package addressee name is unknown at the destination
23          address; the package sender name is unknown at the return address; the package has
             address information which is handwritten; the package is mailed from/to a
24          Commercial Mail Receiving Agency (CMRA); the package is addressed to
             residential areas; the package is addressed from an individual to an individual; the
25          package[] [is] wrapped in brown paper and/or heavily taped; and the ZIP Code from
             where the package is mailed is different than the ZIP Code used in the return address.
26

27   *Id*., at 14-15.

28

PI Carbonetti's affidavit further stated that inspectors further scrutinize packages that bear the noted characteristics. *Id.*, at 15. Inspectors conduct address verifications on the addresses and names. *Id.* Further, the packages are subject to narcotic-detecting canine examination. *Id.*

PI Carbonetti stated that, on July 30, 2013, he was contacted by a Postal Inspector in Cleveland about four suspicious-looking express mail packages that appeared to have been sent by the same person. *Id.* All of the packages contain the same sender's name, Jay Brown, though each package has a different return address in Ohio. *Id.* Further, each package was addressed to a different location in Las Vegas, Nevada. *Id.* PI Carbonetti stated that PI Kudley conducted address checks for the sender on two of the parcels, both of which returned bad addresses, and that canine examination of those two parcels resulted in alerts. *Id.* PI Carbonetti further stated that PI Kudley obtained federal search warrants in Ohio for these two packages and, when he executed them, found that each package contained a DVD player with $15,000 cash hidden inside. *Id.*

On August 1, 2013, PI Kudley again contacted PI Carbonetti, and told him that another package - Package 5 - had arrived at a post office in Las Vegas. *Id.*, at 16. This package contained the same sender's name as the prior packages, and was addressed to Jennifer Peskett. *Id.* PI Kudley told PI Carbonetti that one of the packages on which he executed a search warrant in Ohio was also addressed to Jennifer Peskett. *Id.* Based on this information, PI Carbonetti conducted a criminal history check on Defendant Peskett, and noted that she has a prior arrest for Possession of Marijuana for Sale and Cultivating Marijuana. *Id.*

PI Carbonetti noted that Packages 3, 4 and 5 were all mailed on July 30, 2013, from three different cities in Ohio, approximately three hours apart. *Id.* On August 1, 2013, PI Carbonetti conducted address checks on the sender name and address and recipient names and addresses of Packages 3, 4, and 5. *Id.* For Package 3, PI Carbonetti found that the sender name and address were invalid, and that the recipient name and address were valid. *Id.*, at 16-17. PI Carbonetti stated that drug proceeds are often shipped to a valid name and address to ensure that they arrive safely. *Id.*, at 17. For Package 4, PI Carbonetti found that the sender name and address were invalid, and that the recipient name was invalid, but the address is good and appears to be the address of a business. *Id.* For Package 5, PI Carbonetti found that the sender name and address were invalid. *Id.* The

1  recipient address was valid, but the name was associated with an entirely different address in North

2  Las Vegas, Nevada. *Id.*

3       On August 1, 2013, Packages 3, 4 and 5 were subjected to YaYa, a narcotic detection canine

4  handled by Las Vegas Metropolitan Police Department (LVMPD) Officer Dale Jaeger. *Id.*, at 18.[7]

5  Officer Jaeger advised PI Carbonetti that YaYa gave a positive alert to each of the packages, which

6  indicated "the presence of a narcotic odor or a controlled substance, currency ... or evidence bearing

7  the presence of the odors of heroin, cocaine, marijuana and/or methamphetamine" within the

8  packages. *Id.*[8]

9       Judge Hoffman issued the search warrants for Packages 3, 4 and 5 On August 2, 2013.

10 Hearing Exhibits 3B, 4, 5.   When PI Carbonetti executed these search warrants, he found $15,000

11 in United States currency in a hollowed-out Sony DVD player inside each package. Docket No. 70,

12 at 3; Hearing Exhibits 3B, 4, 5.

13       **D.       Defendant Peskett's Statements**

14       On August 3, 2013, Defendant Peskett traveled to the Emerald Post Office in Las Vegas

15 looking for Package 5. Docket No. 70, at 3. Employees at that office provided Defendant with PI

16 Carbonetti's telephone number and told her to contact him. *Id.*   PI Carbonetti then received a

17 telephone call from Defendant, who advised him that she was missing a package containing court

18 documents and a DVD player that had been sent to her by her lawyer, Jay Brown. *Id.*   Defendant

19 provided PI Carbonetti with the tracking number for Package 5. *Id.*   When PI Carbonetti asked

20 Defendant for additional information on the sender, she "became agitated" and stated that she did

21 not know the contact address or phone number for the sender of the package. *Id.*   Defendant did,

22 however, provide PI Carbonetti with her own telephone number. *Id.*

23 . . . .

24

25       [7]This law enforcement officer testified at the evidentiary hearing that he is a detective, not
an officer; however, the affidavit calls him officer.  Docket No. 61-2 at 18.  Therefore, when
26 discussing the facts in the affidavit, the Court refers to him as Officer rather than Detective.

27       [8]The affidavit also discusses YaYa and his handler's certification and training. *Id.*  Since
Detective Jaeger testified at length about certification and training, the Court discusses both in the
28 section regarding Detective Jaeger's testimony.

1  **E.**     **Testimony of Detective Patrick Andrejcak**

2      Detective Andrejcak has been a canine handler in the narcotics unit of the Cleveland Police

3  Department for six years.  Hearing Tr. (8/3/2015) at 10:13-10:14 a.m.  He and his canine partner,

4  Daisy, are certified for narcotics detection by the Ohio Police Officer Training Academy.  Hearing

5  Tr. (8/3/2015) at 10:14 a.m.  Detective Andrejcak and Daisy went through an initial six weeks of

6  training - approximately 40 hours or longer per week - with a canine handler.  Hearing Tr. (8/3/2015)

7  at 10:14 a.m., 10:35 a.m.; 10:42 a.m.  Daisy is trained to take specific action upon her detection of

8  narcotics - specifically, the odors of marijuana, heroin, methamphetamine and cocaine - and is

9  considered a single-purpose dog.  Hearing Tr. (8/3/2015) at 10:15 a.m.; 11:16 a.m.  Daisy is not

10  trained to alert to any other odor.  Hearing Tr. (8/3/2015) at 11:22-11:23 a.m.

11      Detective Andrejcak and Daisy were first certified in May 2010, and remain certified to date.

12  Hearing Tr. (8/3/2015) at 10:15 a.m.  Since 2013, Detective Andrejcak and Daisy have been certified

13  on an annual basis by the Ohio Peace Officer Training Commission, which is an agency that is

14  separate and distinct from the Cleveland Police Department, where they work.  Hearing Tr.

15  (8/3/2015) at 10:16 a.m., 10:29-10:30 a.m.; Hearing Exhibits 6A, 6B.  Daisy is considered a passive

16  alert dog.  Hearing Tr. (8/3/2015) at 10:16 a.m.  If she detects the odor of one of the four narcotics

17  for which she is trained, she will change her behavior.  Hearing Tr. (8/3/2015) at 10:17 a.m.  Daisy's

18  alert is that she will sit.  Hearing Tr. (8/3/2015) at 10:17 a.m.  Daisy can detect the odor of narcotics

19  even after the drugs are removed from a specific area because the odor of the narcotics remains in

20  the area even after the drug itself is no longer there.  Hearing Tr. (8/3/2015) at 10:18 a.m.  Dogs'

21  olfactory capabilities are substantially greater than those of humans.  Hearing Tr. (8/3/2015) at 11:17

22  a.m.

23      Daisy lives with Detective Andrejcak and they have a close relationship.  Hearing Tr.

24  (8/3/2015) at 10:36 a.m.  A different trainer initially trained her, and Detective Andrejcak initially

25  trained Daisy along with another trainer.  Hearing Tr. (8/3/2015) at 10:37-10:38 a.m.  Detective

26  Andrejcak trains Daisy every Tuesday.  Hearing Tr. (8/3/2015) at 11:25 a.m.  During training

27  exercises, Daisy receives a tennis ball as a reward.  Detective Andrejcak does not reward Daisy in

28  the field.  Hearing Tr. (8/3/2015) at 10:31 a.m.; 10:41 a.m.; 11:12 a.m.  Daisy does not know if she

- 10 -

1    makes a mistake in alerting.  Hearing Tr. (8/3/2015) at 10:41 a.m.  Daisy has never been trained to

2    alert to the odor of currency, and has never been certified to ignore currency.  Hearing Tr. (8/3/2015)

3    at 10:35 a.m., 10:53 a.m.  Daisy trained on currency one time, prior to certification.  Hearing Tr.

4    (8/3/2015) at 10:53 a.m.  Daisy did not train on currency in 2013.  Hearing Tr. (8/3/2015) at 11:12

5    a.m.  She has also been trained using soap as a distractor,[9] since Detective Andrejcak has come

6    across soap being used as a distractor in the field.  Hearing Tr. (8/3/2015) at 10:33-10:34 a.m.

7           Daisy's training records indicate that she has made mistakes in training exercises.  Hearing

8    Tr. (8/3/2015) at 10:53 a.m.  In 2009, prior to her initial certification, the records indicate that Daisy

9    gave approximately four false alerts during training.  Hearing Tr. (8/3/2015) at 10:54 a.m., 11:18

10   a.m.; Hearing Exhibit A.  In 2010, the records indicate three false alerts during training.  Hearing Tr.

11   (8/3/2015) at 11:00-11:01 a.m.; Hearing Exhibit B.  On a fourth occasion in 2010, Daisy detected

12   a drug odor, but was not able to pinpoint it.  Hearing Tr. (8/3/2015) at 11:02 a.m.  In 2011, Daisy's

13   training records indicate that she made two false alerts and that, on one occasion, Detective

14   Andrejcak had to detail Daisy.[10]  Hearing Tr. (8/3/2015) at 11:05-11:06 a.m.; Hearing Exhibit C.

15   On that occasion, all of Daisy's alerts were good, but alerted on a locker.  Hearing Tr. (8/3/2015) at

16   11:20 a.m.  When taken back through the room, Daisy did not alert on the locker again.  Hearing Tr.

17   (8/3/2015) at 11:20 a.m.

18          Finally, Daisy's training records for 2013 indicate that she alerted to a locker that was empty

19   on one occasion.   Hearing Tr. (8/3/2015) at 11:09-11:10 a.m.; Hearing Exhibit D.  During this

20   training, many rooms were searched and, when Daisy was taken back through this room twice, she

21   did not alert to the locker again.  Hearing Tr. (8/3/2015) at 11:10 a.m., 11:19 a.m.  All of these errors

22   were made in training exercises.  Hearing Tr. (8/3/2015) at 11:18 a.m.  Detective Andrejcak testified

23   that he knows of no dog who made no mistakes from the beginning of training.  Hearing Tr.

24

25

26          [9]A distractor is anything that could cover the smell of narcotics, such as soap, peanut butter,
     oil or transmission fluid, that would cause a dog not to be able to smell the narcotics during a sniff.
27   Hearing Tr. (8/3/2015) at 10:32 a.m.

28          [10]Detective Andrejcak testified that detailing means that he brought Daisy back through the
     room to sniff again if she missed an odor.  Hearing Tr. (8/3/2015) at 11:02 a.m.

1  (8/3/2015) at 11:18-11:19 a.m.  More training records exist for Daisy than those marked in Exhibits

2  A-D, and include many more accurate alerts.  Hearing Tr. (8/3/2015) at 11:24 a.m.

3        On July 30, 2013, Detective Andrejcak was contacted by PI Kudley and asked to respond to

4  the Post Office.[11]  Hearing Tr. (8/3/2015) at 10:23 a.m.  PI Kudley said he had some packages he

5  would like the dog to sniff.  Hearing Tr. (8/3/2015) at 10:24 a.m.  After speaking with PI Kudley,

6  Detective Andrejcak subjected Daisy to the packages.  Hearing Tr. (8/3/2015) at 10:24 a.m.  Package

7  1 was placed in a room, before Detective Andrejcak and Daisy went into the room, along with

8  several control packages.[12]  Hearing Tr. (8/3/2015) at 10:25 a.m.  Package 2 was placed in a different

9  room than Package 1, along with control packages.  Hearing Tr. (8/3/2015) at 10:27 a.m.  In both

10  cases, Detective Andrejcak did not know which packages were control packages and which package

11  was the target package, and all of the packages had a similar appearance.  Hearing Tr. (8/3/2015) at

12  10:26-10:27 a.m.  Daisy alerted on Packages 1 and 2.  Hearing Tr. (8/3/2015) at 11:21 a.m.  She was

13  not indecisive in her alerts.  Hearing Tr. (8/3/2015) at 11:21 a.m.

14       **F.**     **Testimony of Detective Dale Jaeger**

15        Las Vegas Metropolitan Police Department (LVMPD) Detective Dale Jaeger is assigned to

16  the narcotics section, interdiction task force, and has been a canine handler for ten years.  Hearing

17  Tr. (8/3/2015) at 11:38-11:39 a.m.  He has had two canine partners, both of whom were solely

18  narcotic detection dogs.  Hearing Tr. (8/3/2015) at 11:39-11:41 a.m.  For the past five-and-one-half

19  years, Detective Jaeger has been partnered with a dog named YaYa.  Hearing Tr. (8/3/2015) at 11:40

20  a.m., 12:04 p.m.  Initially, Detective Jaeger completed a 280-hour handler class with his first dog.

21  Hearing Tr. (8/3/2015) at 11:41 a.m.  YaYa was initially trained through master trainers, for

22  approximately 240 hours.  Hearing Tr. (8/3/2015) at 11:41-11:42 a.m., 12:05 p.m.  After that,

23  Detective Jaeger and YaYa went through three to four weeks of training as a pair.  Hearing Tr.

24  

25      [11]Detective Andrejcak provided to PI Kudley the information regarding Daisy and her sniffs
of the packages that appears in the search warrant affidavits.  Hearing Exhibits 1, 2.  Hearing Tr.

26  (8/3/2015) at 10:23 a.m.

27      [12]A control package is a package that the PI knows contains no illegal substances.  The target
package is the one that is suspected of containing illegal substances.  Hearing Tr. (8/3/2015) at 10:25

28  a.m.

1   (8/3/2015) at 11:41-11:42 a.m.  He and YaYa engage in continued training during the work week

2   to make sure the dog stays on track and is accurate in his alerts.  Hearing Tr. (8/3/2015) at 11:42

3   a.m., 12:02 p.m.

4       Detective Jaeger and YaYa must be certified twice a year.  Hearing Tr. (8/3/2015) at 11:42

5   a.m., 12:07 p.m.  During the first half of the year, they must be certified by LVMPD supervised by

6   a canine sergeant and, during the second half of the year, they must be certified by the California

7   Narcotic Canine Association (CNCA). Hearing Tr. (8/3/2015) at 11:42-11:43 a.m. Detective Jaeger

8   and YaYa have been certified four times each by CNCA and by LVMPD, and they have been

9   continuously certified since their initial certification, with no lapse in certification.  Hearing Tr.

10  (8/3/2015) at 11:43 a.m.  Hearing Exhibits 7A, 7B.  CNCA is an agency that is independent from

11  LVMPD.  Hearing Tr. (8/3/2015) at 11:56-11:57 a.m.

12      YaYa is trained to detect marijuana, methamphetamine, cocaine and heroin.  Hearing Tr.

13  (8/3/2015) at 11:50 a.m.  If he detects one of these odors, he has a behavioral change.  Hearing Tr.

14  (8/3/2015) at 11:50 a.m., 12:36 p.m.  Detective Jaeger stated that YaYa brackets, wags his tail and

15  looks back at Detective Jaeger as his behavioral change.  Hearing Tr. (8/3/2015) at 11:54-11:55 a.m.

16  When he finds the source of the odor, he freezes and holds his nose on the source.  Hearing Tr.

17  (8/3/2015) at 11:50-11:51 a.m., 12:36 p.m.  Unless YaYa has a change of behavior, he has not

18  alerted to narcotics.  Hearing Tr. (8/3/2015) at 11:51 a.m., 12:37 p.m.

19      YaYa lives with Detective Jaeger and his wife, though his wife is not involved with training

20  the dog, and only feeds YaYa if Detective Jaeger is out of town.  Hearing Tr. (8/3/2015) at 12:02

21  p.m.  Detective Jaeger has some dogs and cats as pets, but YaYa is not one of his pets.  Hearing Tr.

22  (8/3/2015) at 12:02-12:03 p.m.  Detective Jaeger only shows YaYa affection at work - home is just

23  for rest.  Hearing Tr. (8/3/2015) at 12:03 p.m.

24      YaYa was trained on currency in January 2012.  Hearing Tr. (8/3/2015) at 11:53 a.m., 12:06

25  p.m.  He had to be weighted off the currency initially, but later ran clean, meaning that he did not

26  stop for the currency.  Hearing Tr. (8/3/2015) at 11:54 a.m., 12:06 p.m.  Although the defense expert

27  termed this an alert, Detective Jaeger testified that that characterization was incorrect and that YaYa

28  did not alert, as YaYa just sniffed around, but did not change behavior.  Hearing Tr. (8/3/2015) at

11:54-11:55 a.m., 12:06 p.m.  Detective Jaeger never called that incident as an alert.  Hearing Tr. (8/3/2015) at 11:54 a.m.[13]  The training records provided by Detective Jaeger in the instant case do not indicate a training with currency other than this one.  Hearing Tr. (8/3/2015) at 12:07 p.m.  YaYa may have missed odors during training, but has not made a false alert.  Hearing Tr. (8/3/2015) at 11:59 a.m.-12:00 p.m., 12:38 p.m.  Over the years, Detective Jaeger has used diversions in training YaYa.  Hearing Tr. (8/3/2015) at 12:16 p.m.  He used them a few times in YaYa's 2011-2012 training records.  Hearing Exhibit F; Hearing Tr. (8/3/2015) at 12:16 p.m.  Diversions that were used during YaYa's training in 2011 and 2012 include currency, cotton, coffee and plastic.  Hearing Tr. (8/3/2015) at 12:19-12:23 p.m.  In 2012, out of a total of 92 trainings, diversions were used in approximately seven.  Hearing Tr. (8/3/2015) at 12:22 p.m.  Detective Jaeger got YaYa in December 2011, and engaged in eight trainings with him that month, and no diversions were used in any of those trainings.  Hearing Tr. (8/3/2015) at 12:23 p.m.  Other training records exist for YaYa - Detective Jaeger provided the ones that were relevant to the time period for the instant case.  Hearing Tr. (8/3/2015) at 12:28 p.m.

On August 1, 2013, PI Carbonetti called Detective Jaeger (who was on call), told him he had three suspicious packages, and asked him to bring YaYa to sniff them.[14]  Hearing Tr. (8/3/2015) at 11:47 a.m., 12:08-12:09 p.m.  Detective Jaeger asked PI Carbonetti to add two additional control packages per target package prior to the dog sniff, which is standard practice, so that YaYa had a total of nine packages to sniff.  Hearing Tr. (8/3/2015) at 11:48 a.m., 12:11 p.m.  Detective Jaeger did not know which of the packages were target packages and which were control packages, and he did not touch the packages prior to YaYa's sniff.  Hearing Tr. (8/3/2015) at 11:49 a.m.  PI Carbonetti spread all nine packages outside on a large lawn area.  Hearing Tr. (8/3/2015) at 11:48-11:49 a.m., 12:09 p.m.  Detective Jaeger never touched the packages prior to the sniffs.  Hearing Tr. (8/3/2015) at 12:27 p.m.  He prefers that the packages are laid out three to four feet apart from each other for

[13]YaYa has been involved in a prior court case regarding currency, and did not alert directly to the currency.  Hearing Tr. (8/3/2015) at 12:34 p.m.

[14]Detective Jaeger provided to PI Carbonetti the information regarding YaYa and his sniffs of the packages that appears in the search warrant affidavit.  Hearing Exhibit 3A.  Hearing Tr. (8/3/2015) at 11:45 a.m.

1  YaYa to sniff.  Hearing Tr. (8/3/2015) at 12:31-12:32 p.m.  Detective Jaeger, who works YaYa off

2  lead so he can't control the dog,[15] directed him toward the boxes.  Hearing Tr. (8/3/2015) at 11:49-

3  11:50 a.m.  YaYa sniffed each package, and alerted on Packages 3, 4 and 5, by exhibiting a change

4  of behavior followed by freezing his nose on each parcel.[16]  Hearing Exhibit 3A at 8; Hearing Tr.

5  (8/3/2015) at 12:10 p.m., 12:12 p.m.  YaYa is never rewarded in the field because Detective Jaeger

6  does not pay the dog for an unconfirmed alert, and alerts in the field are never confirmed while the

7  dog is present.[17]  Hearing Tr. (8/3/2015) at 11:52 a.m., 11:58 a.m., 12:13-12:14 p.m.

8       **G.**     **Testimony of Andre Falco Jiminez**

9       Mr. Jiminez was called as an expert witness by Defendants, and testified as an expert in the

10  field of training and evaluation of dog sniff alerts.  Hearing Tr. (8/3/2015) at 12:42 p.m., 1:02-1:03

11  p.m.  He has owned the Falco Canine Academy, which trains police dogs, since 1991.  Hearing Tr.

12  (8/3/2015) at 12:43 p.m.  He worked as a canine officer from 1989 to 1995.  Hearing Tr. (8/3/2015)

13  at 12:43 p.m.  He has been certified as a dog handler/evaluator in California.  Hearing Tr. (8/3/2015)

14  at 12:44 p.m.  While working as a canine handler, he became passionate about training, and became

15  a canine trainer.  Hearing Tr. (8/3/2015) at 12:44 p.m.  Mr. Jiminez has taught all over the world on

16  this subject.  Hearing Tr. (8/3/2015) at 12:44-12:45 p.m.

17       Mr. Jiminez has high regard for CNCA, and was once a member of CNCA.  Hearing Tr.

18  (8/3/2015) at 12:50 p.m., 1:02 p.m., 1:10 p.m.  He does not have a dog now, so he can no longer be

19  a member, and last was in 1997.  Hearing Tr. (8/3/2015) at 1:10 p.m.  Both Daisy and YaYa (along

---

21      [15]Nonetheless, Detective Jaeger testified that YaYa is an independent animal who does not respond to the detective's behavior.  He testified that YaYa is there for the hunt, not for the detective.  Hearing Tr. (8/3/2015) at 12:39 p.m.

23      [16]Detective Jaeger testified that it is possible that YaYa alerted to a residual odor of narcotics.  Hearing Tr. (8/3/2015) at 12:24 p.m.  At some point, the packages on which he alerted (or the contents of those packages) came into contact with narcotics.  Hearing Tr. (8/3/2015) at 12:24 p.m.  Detective Jaeger does not know to which of the four narcotics odors YaYa alerted.  Hearing Tr. (8/3/2015) at 12:25 p.m.  Further, if another dog had sniffed one of the packages prior to YaYa's sniff, it would not affect the results of the sniff.  YaYa only alerts to the four narcotics odors for which he is trained, and not to dog odors.  Hearing Tr. (8/3/2015) at 12:33 p.m.  YaYa is used to the odors of other dogs, and has never been confused by them in the past.  Hearing Tr. (8/3/2015) at 12:33 p.m.

28      [17]When YaYa is rewarded, during training exercises, his reward is a standard black medium-size Kong toy with no food in it.  Hearing Tr. (8/3/2015) at 11:53 a.m., 12:14-12:15 p.m., 12:39 p.m.

with their handlers) were certified to find narcotics by agencies independent of the ones for which they worked. Hearing Tr. (8/3/2015) at 1:28 p.m. Although in his report, he mistakenly stated that YaYa and Detective Jaeger's certification was invalid because they were certified only by LVMPD, knowing that they were also certified by CNCA, an independent agency, does not change his opinion. Hearing Tr. (8/3/2015) at 1:09-1:12 p.m., 1:28 p.m.

Mr. Jiminez listened to the testimony of Detective Andrejcak and Detective Jaeger, and also reviewed Daisy and YaYa's training records. Hearing Tr. (8/3/2015) at 12:46 p.m. He testified to the importance of proofing a dog off currency and plastic bags during training, partially because both are often found near narcotics and a dog should be trained to separate them rather than to alert at currency. Hearing Tr. (8/3/2015) at 12:48-12:49 p.m. Training a dog to proof off currency is also important because of forfeiture issues. Hearing Tr. (8/3/2015) at 12:49 p.m. Daisy's records showed no training with currency, which is a problem. Hearing Tr. (8/3/2015) at 12:50 p.m. Additionally, YaYa's records showed that the dog was weighted off currency on one occasion. Hearing Tr. (8/3/2015) at 12:50-12:51 p.m. Mr. Jiminez testified that weighting YaYa off currency meant that something significant occurred with the currency. Hearing Tr. (8/3/2015) at 12:51-12:52 p.m.

Mr. Jiminez also opined that Daisy's records show a lack of supervision of her handler. Hearing Tr. (8/3/2015) at 12:55 p.m. YaYa's records do as well, but the issue is not as significant as with Daisy. Hearing Tr. (8/3/2015) at 12:56 p.m. In his opinion, a supervisor should sign off on the training records because, when he did not have a supervisor watching over him, he and the rest of his team did not try to change what they were doing for the better and essentially became lazy. Hearing Tr. (8/3/2015) at 12:56-12:57 p.m. A supervisor may have told the detectives to use currency during training more often. Hearing Tr. (8/3/2015) at 12:58 p.m. Mr. Jiminez based part of his opinion on "poor training, lack of proper certification, and when the dog is rewarded in the field." Hearing Exhibit 8 at 1; Hearing Tr. (8/3/2015) at 10:31 a.m. The dogs in the instant case were not given their primary rewards in the field, but may have been told they were good dogs at the end, which is also a reward. Hearing Tr. (8/3/2015) at 1:15-1:16 p.m.

Mr. Jiminez testified that it is common for dogs to live at home with their handlers, and is not an issue regarding the dogs' reliability or objectivity. Hearing Tr. (8/3/2015) at 12:59-1:00 p.m.

1   The only potential problem is that some dogs can get too comfortable at home and not want to go

2   to work.  Hearing Tr. (8/3/2015) at 1:00 p.m.  The home environment has little effect on a dog's

3   work.  Hearing Tr. (8/3/2015) at 1:01 p.m.

4        Mr. Jiminez testified that training dogs with distractors is important.  Hearing Tr. (8/3/2015)

5   at 12:47 p.m.  He further testified that currency, food and plastic are all distractors.[18]  Hearing Tr.

6   (8/3/2015) at 1:04 p.m., 1:20 p.m.  Tobacco, however, is not generally a distractor.  Hearing Tr.

7   (8/3/2015) at 1:03 p.m.  A dog who does not train with distractions is less reliable.  Hearing Tr.

8   (8/3/2015) at 12:58 p.m.  Two distractors together do not increase the possibility that a dog will alert

9   off a distractor.  Hearing Tr. (8/3/2015) at 1:04 p.m.  Dogs naturally smell odors that are present.

10  Hearing Tr. (8/3/2015) at 1:13-1:14 p.m.  Training dogs regards what they do when they smell

11  certain odors.  Hearing Tr. (8/3/2015) at 1:13 p.m.  Dogs smell other odors and work through them

12  to find the ones they're trained to look for.  Hearing Tr. (8/3/2015) at 1:14 p.m.  He believed that

13  neither Daisy nor YaYa's sniffs were reliable because their ability to proof off currency was not

14  reliable.  Hearing Tr. (8/3/2015) at 1:05 p.m., 1:29 p.m.

15  **II.    ANALYSIS**

16       **A.    Standing**

17       Defendant Peskett has moved to suppress only her statements and the two packages

18  addressed to her - Packages 1 and 5.  *See* Docket No. 61.  The United States, though it opposes

19  Defendant Peskett's motion, agrees that she has standing to challenge the probable cause as it relates

20  to Packages 1 and 5, or her standing to challenge the legality of her statements.  *See* Docket No. 70.

21  Defendant Hunsberger has joined Defendant Peskett's motion.  *See* Docket No. 63.  The United

22  States challenges his standing to join this motion.  Docket No. 70, at 4-6.

23       Defendant Alkeine has moved to suppress all five packages.  *See* Docket No. 57.  Defendant

24  Hunsberger has joined Defendant Alkeine's motion.  *See* Docket No. 62.  The United States, though

25  it opposes Defendant Alkeine's motion, agrees that he has standing to challenge the probable cause

26

27       [18]Mr. Jiminez testified as to the difference between distractors and masking agents.  A
28  distractor takes a dog off task, while a masking agent physically masks the item.  Hearing Tr.
(8/3/2015) at 12:46-12:47 p.m.

1    as it relates to Package 3, and challenges Defendant Alkeine's standing to move to suppress the other

2    four packages.  The United States challenges Defendant Hunsberger's standing to challenge the

3    search of any of the packages.  Docket No. 70 at 4-6.

4            Since the Fourth Amendment protects people not places, the "capacity to claim the protection

5    of the Fourth Amendment depends . . . upon whether the person who claims the protection of the

6    Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Olson*, 495

7    U.S. 91, 95 (1990) (citing *Katz v. United States*, 389 U.S. 347 (1967).  In order to have "standing"

8    or "capacity" to contest the legality of a search or seizure, a defendant must "demonstrate that [he

9    has] a legitimate expectation of privacy in the items seized or the area searched." *United States v.*

10   *Parks*, 285 F.3d 1133, 1141 (9th Cir. 2002) (quoting *United States v. Sarkisian*, 197 F.3d 966, 986

11   (9th Cir. 1999).  "A defendant makes this demonstration by establishing a subjective expectation of

12   privacy in the area searched, that is, one that society would recognize as objectively reasonable."

13   *Parks*, 285 F.3d at 1141 (internal citations omitted).  The defendant, if he has standing, then bears

14   the burden of establishing, under the totality of the circumstances, that "the search or seizure violated

15   his legitimate expectation of privacy in a particular place." *United States v. Davis*, 932 F.2d 752,

16   756 (9th Cir. 1991) (*citing Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).  *See also United States*

17   *v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993).

18           "It has long been established that an addressee has both a possessory and a privacy interest

19   in a mailed package." *United States v. Jefferson*, 566 F.3d 928, 933 (9th Cir. 2009) (quoting *United*

20   *States v. Hernandez*, 313 F.3d 1206, 1209 (9th Cir. 2002).  Therefore, as the United States concedes,

21   Defendants Peskett and Alkeine clearly have standing to contest the legality of the packages that

22   were address to them.  Additionally, a person who mails a package has standing to contest a search

23   of that package.  *See Hernandez*, 313 F.3d at 1209.  In the instant case, the United States believes

24   that "Jay Brown," whose name is listed as the person mailing each of the packages, is a fictitious

25   name.  *See* Docket No. 61-1 at 5; Docket No. 61-2 at 15-17.  Additionally, the United States has

26   alleged that Defendants Hunsberger and Alkeine purchased, in Ohio, "the DVD players that were

27   used to ship the cash from Ohio to Nevada."  Docket No. 1 at 4.  The original complaint in this case

28   alleges that two males, who appear to be Defendants Hunsberger and Alkeine, purchased "seven

DVD players, bubble wrap, black [duct] tape, gloves, utility knife, screwdriver and shipping tape" at a Target in Columbus, Ohio on July 29, 2013. *Id.*, at 4-5. The United States further alleges that a computer using an IP address registered to Defendant Hunsberger to connect to the Internet tracked Packages 1-5 in July and August 2013. *Id.*, at 6. The Court finds, therefore, that the United States' allegations regarding Defendants Hunsberger and Alkeine allow both to establish standing to challenge the legality of the searches of all five packages.

### B.   Franks **Hearing**

Defendant Peskett asks the Court to conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) to determine whether the affidavits submitted in support of the Government's request for the search and seizure warrants on the packages addressed to her were sufficient to establish probable cause. Docket No. 61 at 8-12. In support of her request, Defendant Peskett states that, since both dogs were not trained to ignore the presence of currency, the information in the affidavits stating that they alerted to the odor of narcotics is materially false and misleading. Id., at 10, 12. Additionally, Defendant Peskett submits that the references to Daisy's training impliedly indicated proper training, which is also materially false and misleading. *Id.*, at 10. Defendant Peskett further states that, taking these references out of the affidavits, causes the affidavits to lack probable cause and, therefore, the searches of Packages 1 and 5 should be suppressed. *Id.*, at 10-14.

The United States opposes Defendant Peskett's request for a *Franks* hearing. Docket No. 70 at 14. The United States submits that Defendant Peskett has failed to make the substantial preliminary showing necessary to entitle her to such a hearing. *Id.* Further, the United States submits, Defendant Peskett has shown simply that she disagrees with the statements in the affidavits, which does not meet the requirement of showing that the information in the affidavits is intentionally or recklessly false. *Id.*

In *Franks v. Delaware*, *supra*, the Supreme Court addressed at length whether a false statement by a government affiant invalidates a search warrant. *United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001) (citation omitted). The Court held that, under certain circumstances, a defendant is entitled to an evidentiary hearing to afford the defendant an opportunity to attack the

veracity of a facially-valid affidavit used to support a search warrant. A defendant can challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (*citing United States v. Stanert,* 762 F.2d 775, 780-81 (9th Cir. 1985)).

Before a criminal defendant is entitled to go beneath the search warrant to obtain additional information concerning the police investigation and an informant, he or she is required to make a substantial threshold showing. A defendant's preliminary showing cannot be "merely conclusory." *Reeves*, 210 F.3d at 1044. "There must be allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof." *Hammett*, 236 F.3d at 1058 (*quoting Franks*, 438 U.S. at 171). "To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted). The movant bears the burden of proof and must make a substantial showing to support both elements. *See United States v. Garcia–Cruz*, 978 F.2d 537, 540 (9th Cir.1992).

Intentional or reckless omissions may provide grounds for a *Franks* hearing. *United States v. Jawara*, 474 F.3d 565 (9th Cir. 2007)); *see also United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985) ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate [judge] will draw. To allow a magistrate [judge] to be misled in such a manner could denude the probable cause requirement of all real meaning"). Although "[c]lear proof of deliberate or reckless omission is not required," a "[d]efendant 'must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reason for omitting facts in order to prove a deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809, 822-23 (7th Cir. 2003). A defendant must also show that the "affidavit, once corrected and supplemented," would not "provide ... a substantial basis for concluding that probable cause existed." *Stanert*, 762 F.2d at 782. "[T]he omission rule does not require an affiant to provide general information about

1    every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief

2    that probable cause existed for the search." *Craighead* 539 F.3d at 1081.

3         Here, Defendant Peskett has not made the substantial preliminary showing necessary for a

4    *Franks* hearing. Her allegations are merely conclusory, and are not accompanied by an offer of proof.

5    *See Craighead*, 539 F.3d at 1073.  Instead, she simply claims that the two dogs did not really alert

6    to the odor of narcotics, as stated in the affidavits, and that Daisy's training was not adequate.  She

7    presents nothing to show that the affiant's statements were made with deliberate falsehood or

8    reckless disregard for the truth.  Therefore, she has failed to meet even the first *Franks* prong.

9    Accordingly, the Court denies the request for a *Franks* hearing.

10        **C.    Detention of Packages**

11        Defendants assert that the detention of the packages violate their rights.  Docket No. 61 at

12   8 ("[a]fter PI [Carbonetti] opened Package [5] and determined the package did not contain narcotics,

13   the package should have been delivered to Ms. Peskett" ... "[t]he government's failure to deliver

14   Package [5] interfered with Ms. Peskett's possessory rights..."); Docket No. 57 at 3.

15        Postal inspectors may detain a package to conduct an investigation "if they have a reasonable

16   and articulable suspicion" that it contains contraband or evidence of illegal activity.  *Aldaz,* 921 F.2d

17   227, 229 (9th Cir. 1990).  To determine whether reasonable suspicion exists, reviewing courts "must

18   look at the 'totality of the circumstances' of each case to see whether the detaining officer has a

19   'particularized and objective basis' for suspecting legal wrongdoing."  *United States v. Arvizu*, 534

20   U.S. 266, 273 (2002).  In evaluating the totality of the circumstances, the court may not consider

21   each factor in isolation. *See id*. at 274 (rejecting evaluation of the listed factors in isolation from each

22   other as a type of "divide-and-conquer analysis"). Reasonable suspicion may exist even if each

23   factor, standing alone, is susceptible to an innocent explanation.  *United States v. Hernandez*, 313

24   F.3d 1206, 1210 (9th Cir. 2002).

25        In *Hernandez*, the Court found that the postal inspector had a reasonable and articulable

26   suspicion to detain the package at issue for a dog sniff.  *Id*., at 1211.  The Court listed some of the

27   factors contributing to his suspicion as his training and experience, as well as five factors that, taken

28   together, contributed to his suspicion, including the fact that he could not confirm the name of the

1   return addressee, and he knew that drug traffickers often use fictitious names; the package was

2   shipped by express mail, and he knew that drug traffickers often use express mail because they can

3   track packages easily and the drugs generally arrive quickly and predictably; the label on the package

4   was handwritten, and traffickers usually send packages of drugs from one individual to another with

5   handwritten labels; the package had been mailed from California, a known drug source state; and

6   the package had been taped up "fairly well." *Id.*

7          The *Hernandez* court further noted that the factors identified by the postal inspector appeared

8   to be one of the elements of the Postal Inspection Service's drug package profile, and those factors'

9   presence in that profile increased the Court's confidence in the reasonableness of his suspicion. *Id.*

10   *See also United States v. Hill*, 701 F.Supp. 1522, 1528 (D.Kan.1988) ("[t]he Drug Package Profile

11   does not contain completely arbitrary criteria. Instead, the profile was developed at a national level

12   and was based on information gleaned from national investigations of narcotics mailings"). The

13   Court held, looking at the totality of the circumstances, that the postal inspector "had a reasonable

14   suspicion sufficient to justify his detention of the package so that a drug dog could smell it." *Id.*

15          In the instant case, PI Kudley and PI Carbonetti also relied on their training and experience,

16   as well as many of the same factors as those listed above, in developing their reasonable and

17   articulable suspicion to detain the packages for a dog sniff.  The Court finds, looking at the totality

18   of the circumstances, that both postal inspectors had reasonable suspicion that justified their

19   detention of the packages for the dog sniffs[19] and that, therefore, the detention did not violate

20   Defendants' rights.[20]

21   . . . .

22   . . . .

23   . . . .

24

25          [19]Additionally, the dog sniffs occurred within a very brief period of time after the initial
26   detention of the packages.  Therefore, the Court finds that no prolonged detention occurred in the
     instant case.  *See Hernandez*, 313 F.3d at 1212.

27          [20]Once the search warrants were executed and the packages were opened, the contents
28   became evidence for the instant case.  Therefore, the failure to deliver the packages as addressed did
     not violate Defendants' rights.

D.     **Suppression of Searches**

Taken together, the motions to suppress ask the Court to suppress the searches of all five packages as, they claim, the affidavits lack probable cause to support the issuance of the search warrants. *See* Docket Nos. 57, 61.

Probable cause is "a fluid concept turning on the assessment of probabilities and the particular factual context not readily, or even usefully, reduced to a neat set of legal rules," and its existence must be determined by an analysis of the totality of the circumstances surrounding the intrusion. *Gates*, 462 U.S. at 232. Probable cause does not deal with hard certainties, but with probabilities. *Id*. at 241; *see also Brinegar v. United States*, 338 U.S. 160, 175 (1949) (Probable cause deals with "probabilities" which are not technical, but factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians act). The United States Supreme Court has repeatedly emphasized that the probable cause standard is a "practical, non-technical conception." *Brinegar,* 338 U.S. at 175.

The *Gates* decision made it clear that a magistrate judge's decision regarding probable cause should be given great deference. The duty of a reviewing court is to insure that the magistrate judge had a substantial basis for concluding that probable cause existed. The Supreme Court has declined to articulate a "neat set of legal rules" for evaluating probable cause, *Gates*, 462 U.S. at 232, and instead has instructed magistrate judges to determine probable cause by considering the "totality-of-the-circumstances," *Gates*, 462 U.S. at 230. In issuing a search warrant, the magistrate judge simply must determine whether there is a "fair probability" that evidence of a crime will be found. *Id*., 462 U.S. at 238, 246.   A reviewing court is required to examine all circumstances set forth in the affidavit, and in doubtful cases, to give preference to the validity of the warrant. *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.), *cert. denied*, 474 U.S. 847 (1985).

It is well recognized that law enforcement officers can rely on their own experience and the experience and information of other law enforcement officers in establishing probable cause. *United States v. Butler*, 74 F.3d 916 (9th Cir. 1996). Similarly, "a magistrate [judge] may rely on the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found." *United States v. Fannin*, 817 F.2d 1379, 1381 (9th Cir. 1987). *See also United States*

1   *v. Ayers*, 924 F.2d 1468, 1479 (9th Cir. 1991) ("in weighing the evidence supporting a request for

2   a search warrant, a magistrate [judge] may rely on the conclusions of experienced law enforcement

3   officers regarding where evidence of a crime is likely to be found.")  An officer need not include *all*

4   of the information in his possession to obtain a search warrant.  An affidavit need only show facts

5   adequate to support the finding of probable cause.  *United States v. Johns*, 948 F.2d 599, 605 (9th

6   Cir. 1991).

7                           **1.      Packages 1 and 2**

8           The affidavits in support of the search warrants for Packages 1 and 2 establish that PI Kudley

9   has received training in the detection and investigation of prohibited mailing offenses, and that the

10  United States Mail is often used by narcotics traffickers to transport controlled substances, as well

11  as U.S. currency derived from the distribution of controlled substances, either as payment or

12  proceeds.  Further, both affidavits state that the United States Postal Service Express Mail is

13  commonly used to transport controlled substances because narcotic traffickers can track the parcels,

14  control dispatch times and locations, and have a guarantee of delivery in one business day, and that

15  people who use the mail to transport controlled substances and/or proceeds of controlled substances

16  often place fictitious address and/or name information on these parcels, particularly on the return

17  address, to conceal their true identities from law enforcement if the parcel is seized.

18          The affidavits in support of the search warrants for Packages 1 and 2 further establish that

19  Nevada is a common origination area and destination point for controlled substances sent through

20  the United States mail, and that Northern Ohio is a common destination point.  They also asserted

21  that Express Mail is a common method used to mail controlled substances and proceeds.  Finally,

22  the affidavits submit that people who regularly handle controlled substances often leave the scent

23  of controlled substances, which narcotic canines are trained to indicate alert, on the box, contents

24  of the box, and/or other packaging material they handle.

25          In addition, the affidavit in support of the search warrant for Package 1 establishes that the

26  package, which was mailed from the Seville, Ohio post office, was identified as suspicious.

27  Additionally, Postal Service inquiries were unable to associate the sender name Jay Brown with the

28  return address or the recipient name Jennifer Peskett with the delivery address.  Further, Package 1

1  was subjected to Daisy, a trained narcotics detection dog, who gave a positive alert on the package.

2  Judge White found that the affidavit established probable cause to search Package 1, and issued a

3  search warrant.

4        In addition, the affidavit in support of the search warrant for Package 2 establishes that the

5  package, which was mailed on the same date as Package 1, from the Jeromesville, Ohio post office,

6  was identified as suspicious.  The affidavit discusses Package 1, and asserts that, when the search

7  warrant was executed on that package, it contained $15,000 in United States currency concealed in

8  a vacuum-sealed food saver bag, a Sony DVD player and a Sony DVD box.  The affidavit further

9  asserts that Packages 1 and 2 are related, because the sender's name and phone number on both

10 parcels are the same, as well as the postage amount, weight and destination of both parcels.

11 Additionally, the affidavit represents that the handwriting on the two parcels is similar, and that

12 Postal Service inquiries were unable to associate the sender name Jay Brown with the return address

13 or the recipient name Executive Entertainment Mgmt Group with the delivery address.  Finally,

14 Package 2 was subjected to Daisy, who gave a positive alert on the package.  Judge White found that

15 the affidavit established probable cause to search Package 2, and issued a search warrant.

16          **2.     Packages 3, 4 and 5**

17        The affidavit in support of the search warrants for Packages 3, 4 and 5 establishes that

18 experience and intelligence gathered by the U.S. Postal Inspection Service (USPIS) have shown that

19 Express Mail and Priority Mail services are frequently utilized by drug traffickers for shipping

20 controlled substances or proceeds/payments, for reasons including speed, reliability, and free

21 package tracking service.  The USPIS has established interdiction programs in cities that have been

22 identified as known sources of controlled substances throughout the United States.  The affidavit

23 further asserts that the USPIS has analyzed packages mailed through its overnight and two-day

24 delivery services that have been found to contain controlled substances or proceeds/payments of

25 sales of controlled substances, and has noted certain common characteristics, such as the labels are

26 usually written as though the package is being sent from an individual to an individual and, when

27 a business or company name is used, it usually is a fictitious name.  In addition, the affidavit states,

28 the analysis found a series of characteristics that, when present in a combination of two or more on

a certain package, indicate a high probability that the package will contain a controlled substance or proceeds of controlled substance sales.  Those characteristics include:  a package mailed from or addressed to a narcotic source city; a package with a fictitious return address; a package whose addressee name is unknown at the destination address; a package whose sender name is unknown at the return address; a package with handwritten address information; a package that is mailed from/to a Commercial Mail Receiving Agency (CMRA); a package that is addressed to residential areas; a package that is addressed from an individual to an individual; a package that is wrapped in brown paper and/or heavily taped; and instances when the ZIP Code from where the package is mailed is different than the ZIP Code used in the return address.

The affidavit in support of the search warrants for Packages 3, 4 and 5 asserts that postal inspectors further scrutinize packages that bear the characteristics noted above, including address verification on the addresses and names.  Additionally, the packages are subject to narcotic-detecting canine examination.

In addition, the affidavit in support of the search warrant for Packages 3, 4 and 5 establishes that PI Carbonetti was contacted about four suspicious express mail packages (Packages 1-4) that appeared to have been sent by the same person.  Each package bore the same sender's name - Jay Brown - but a different return address, and each package was addressed to a different address in Las Vegas.  The affidavit discusses Packages 1 and 2, and asserts that address checks for the sender on both of those parcels returned bad addresses, and that canine examination of those two parcels resulted in alerts.  The affidavit further asserts that the execution of federal search warrants in Ohio on Packages 1 and 2 found a DVD player with $15,000 in United States currency hidden inside each package.

The affidavit further asserts that, two days after learning about these packages, PI Carbonetti learned that Package 5 had arrived at a post office in Las Vegas.  This package contained the same sender's name as the prior packages and was, as was Package 1, addressed to Defendant Peskett. The affidavit further asserts that Defendant Peskett has a prior arrest for Possession of Marijuana for Sale and Cultivating Marijuana.

The affidavit in support of search warrants for Packages 3, 4 and 5 establishes that all three packages were mailed on the same date, approximately three hours apart, from three different cities in Ohio. Postal Service inquiries found that the sender name and address for Package 3 were invalid, but that the recipient name and address were valid, and the affidavit asserted that drug proceeds are often shipped to a valid name and address to ensure that they arrive safely. For Package 4, Postal Service inquiries found that the sender name and address were invalid, and that the recipient name was invalid, but the address is good and appears to be the address of a business. Finally, for Package 5, Postal Service inquiries found that the sender name and address were invalid, and that the recipient address was valid, but the recipient name was associated with an entirely different address in North Las Vegas, Nevada. Finally, Packages 3, 4 and 5 were subjected to YaYa, who gave a positive alert on each package. Judge Hoffman found that the affidavit established probable cause to search Packages 3, 4 and 5, and issued a search warrant for each package.

### 3.      Canine Sniffs

The Court held an evidentiary hearing to determine if the canine sniffs were reliable. As stated more succinctly above, the Court heard testimony from both canine handlers, as well as from a defense expert on canine sniffs. The Court ordered an evidentiary hearing because the parties agreed that a hearing was necessary in order to allow the Court to determine the reliability of the dog sniffs. Docket Nos. 57 at 5-6, 58 at 10-11, 61 at 6. *See also Florida v. Harris*, 133 S.Ct. 1050, 1057 (2013). In addition, "[t]he longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).

The Court is required to weigh the competing evidence presented at the evidentiary hearing in determining the reliability of Daisy and YaYa. *Harris*, 133 S.Ct. at 1058. The Court must consider how the dogs have performed in the past, and whether the circumstances surrounding their alerts in this case may or may not undermine the case for probable cause, for example, if the officer cued the dog during the sniff. *Id*., at 1057-1058. Further, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his

1    alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting,

2    a court can presume (subject to any conflicting evidence offered) that the dog's alert provides

3    probable cause to search." *Id.*, at 1057.

4          The evidence presented at the evidentiary hearing on this matter showed that Daisy has

5    continually been certified as a narcotics sniffing dog, on an annual basis, by a bona fide, independent

6    organization since 2010. She is certified to detect the odors of marijuana, heroin, methamphetamine

7    and cocaine. The evidence further showed that Daisy made some mistakes during training exercises.

8    In 2009, prior to her initial certification, Daisy gave approximately four false alerts during training;

9    in 2010, she gave three false alerts during training and, on a fourth occasion in 2010, Daisy detected

10   a drug odor, but was not able to pinpoint it; in 2011, Daisy's made two false alerts and had to be

11   detailed on one occasion; and, in 2013, Daisy alerted to a locker that was empty on one occasion.

12   Daisy and her handler continue to train once per week, and her training records show many more

13   accurate alerts than false alerts. The evidence further showed that Daisy has never been trained to

14   alert to the odor of currency, has never been certified to ignore currency, and trained on currency one

15   time prior to certification.

16         The evidence presented at the evidentiary hearing showed that Daisy's handler did not know

17   which packages were the target packages (Packages 1 and 2) when he submitted Daisy to sniff them.

18   Each target package was in a room with control packages, all of which had a similar appearance,

19   none of which was touched by Daisy's handler, and all of which Daisy sniffed. Daisy decisively

20   alerted on Packages 1 and 2. Daisy is never rewarded in the field, and was not rewarded in this

21   instance.

22         The evidence presented at the evidentiary hearing showed that YaYa has continually been

23   certified as a narcotics sniffing dog, on a bi-annual basis, since 2012. They are certified during the

24   first half of the year by LVMPD, for whom they work, and during the second half of the year by

25   CNCA, a bona fide independent organization. YaYa is certified to detect the odors of marijuana,

26   heroin, methamphetamine and cocaine. The evidence further showed that YaYa has, during training,

27   may have missed odors, but has never made a false alert. YaYa and his handler continue training

28   during the work week, in order to ensure that he remains on track and accurate in his alerts. YaYa's

1   training records show that he was trained on currency in January 2012.  He was weighted off the

2   currency, but eventually ran clean.  Although Mr. Jiminez terms this incident a false alert, YaYa's

3   handler testified that YaYa did not engage in the behavioral change required for an alert and, thus,

4   did not term this incident an alert.  YaYa's training records also show that he trained with diversions

5   at times.

6         The evidence presented at the evidentiary hearing showed that YaYa's handler did not know

7   which packages were the target packages (Packages 3, 4 and 5) when he submitted YaYa to sniff

8   them.  The packages were laid out on a lawn area, along with six control packages, for a total of nine

9   packages sniffed by YaYa, none of which were touched by YaYa's handler.  YaYa sniffed off-lead

10  and positively alerted to Packages 3, 4 and 5.  YaYa is never rewarded in the field, and was not

11  rewarded in this instance.

12        The evidence showed that Defendants, through Mr. Jiminez, did not contest the adequacy of

13  either Daisy or YaYa's certification.[21]  Defendants took issue with the training of both dogs - Mr.

14  Jiminez felt that not enough diversions were included in training, and that the records showed a lack

15  of supervision of the handlers.  Mr. Jiminez appears to have based his opinion in large part on poor

16  training, lack of proper certification, and the rewarding of the dog in the field.  The testimony and

17  evidence, however, clearly showed that neither dog was rewarded in the field, and that both teams

18  were properly certified.  Further, the Court, after weighing the evidence before it, disagrees that poor

19  training existed for either dog, particularly considering that the training has been considered

20  appropriate by independent certifying agencies, and that both teams engage in continued training.

21  These facts, along with Mr. Jiminez's refusal to amend his opinion even when presented with

22  additional evidence that negates his original reasoning in large part, cause the Court to place little

23  to no weight on his opinion.

24

25  ───────────────

26  [21]In his report, Mr. Jiminez placed great weight on the fact that YaYa was certified only one
    time and only by LVMPD, and not by an independent agency.  When confronted with the fact that
27  YaYa was, in fact, certified by CNCA, an agency with which Mr. Jiminez is familiar and of which
    he has been a member, and on more than one occasion, Mr. Jiminez acknowledged his mistake, but
28  nonetheless stood by his opinion.  Mr. Jiminez's report also places weight on his belief that Daisy
    was only certified one time, which also was inaccurate.

After weighing all of the evidence and testimony presented, the Court finds that both Daisy and YaYa are properly certified by bona fide independent agencies and have, therefore, complied with all of those agencies' requirements for certification. The Court further finds that the training programs for both Daisy and YaYa are adequate and appropriate, and involve hundreds of hours of training for each team. The Court has weighed the evidence regarding the mistakes of each dog during training exercises, and finds that both dogs made accurate alerts far more often than they made mistakes. The Court does not find three to four mistakes per year significant enough to negate the reliability of a dog sniff, particularly in this case where independent agencies have determined that both Daisy and YaYa are reliable enough to continually certify them annually. Finally, the Court finds that the circumstances of the sniffs of the packages in this case were appropriately conducted, and that the handlers could not have (consciously or not) cued the dogs regarding packages that they themselves did not know were the target packages. The Court therefore finds that the sniffs of both Daisy and YaYa in this case were reliable.

Defendants ask this Court to find the sniffs unreliable and, thus, probable cause lacking, because neither dog has been certified to conduct a sophisticated dog sniff. Docket No. 61 at 7. *See also United States v. 22,474.00 in U.S. Currency*, 246 F.3d 1212 (9th Cir. 2001). It is true that a determination regarding a dog's reliability is essential in determining whether probable cause existed. *Grant v. City of Long Beach*, 315 F.3d 1081, 1085 (9th Cir. 2002). Once that reliability have been established, however, the Ninth Circuit "has routinely held that a canine identification or 'alert' or illegal narcotics provides probable cause for the issuance of a search warrant." *Id.*[22] While the forfeiture cases cited by Defendants discuss a sophisticated dog sniff, however, at least one more recent case speaks only of establishing reliability in order to support probable cause as opposed to requiring a sophisticated dog sniff. *See id*. Further, in determining whether probable cause existed to to issue a search warrant, the Court looks to the totality of the circumstances in order to determine whether a fair probability existed at the time of the issuance of the search warrants that would cause

_____

[22]This case does not, as Defendant Peskett implies (Docket No. 61 at 8) require a sophisticated dog sniff in order to meet the "heightened reliability standard" for probable case. *See Grant*, 315 F.3d at 1085-1086.

a reasonable person to believe that contraband or evidence of crime is present. *See id.*, at 1055. After carefully weighing all of the evidence in the affidavits in this case, including the handwritten express mail labels, the packages sent from a person whose name did not match any of the return addresses he used, the packages sent to people whose names did not always match their addresses, the fact that the packages were sent from numerous different post offices in Ohio within three hours of each other, and the dog sniffs, which the Court finds to be reliable, the Court finds that such probability clearly existed.

The probable cause standard for a search warrant is whether, based on common sense considerations, there was "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) (citing *Gates*, 462 U.S. at 238). The magistrate judge need not determine "that the evidence is more likely than not to be found where the search takes place.... The magistrate [judge] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991) (citation and internal quotation marks omitted). Neither certainty nor a preponderance of the evidence is required. *United States v. Kelley*, 482 F.3d 1047, 1050–51 (9th Cir. 2007), citing *Gates*, 462 U.S. at 246 and *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) *(en banc)*.

Reviewing the affidavits as a whole, applying the totality of the circumstances test, and showing the issuing judge great deference as the United States Supreme Court mandates, this court finds that the issuing judge had a substantial basis for concluding that probable cause existed for issuance of these warrants. As the Supreme Court in *Gates* recognized "only the probability, and not a prima facie showing of criminal activity, is the standard of probable cause." 462 U.S. at 235. The evidence presented to Judges White and Hoffman, taken as a whole, established the probability that evidence of illegal activity would be found in the packages sought to be searched in the at-issue search warrants and the accounts sought to be seized in the at-issue seizure warrants, based on factual and practical considerations of everyday life on which reasonable and prudent people act. Accordingly, the Court finds that the search and seizure warrants at issue were supported by probable

1  cause, and recommends **DENYING** Defendants' motions to suppress the evidence recovered from

2  the execution of the search warrants.

3        **E.**      **Suppression of Defendant Peskett's Statement**s

4        Defendant Peskett asks this Court to suppress her statements because the government

5  interfered with her possessory rights by failing to deliver Package 5, thus causing her to make

6  "seemingly incriminating" statements at the post office and to PI Carbonetti. Docket No. 61 at 8.

7  The United States responds that items do not have to be contraband to be legally seized, that police

8  routinely seize non-contraband items and that, so long as the items seized are authorized by the

9  search warrant, they are appropriately seized. Docket No. 70 at 15. The United States further notes

10 that the search warrant for Package 5 authorized the seizure of drug proceeds and that, considering

11 other circumstances in the case, seizure was appropriate. *Id*. In reply, Defendant Peskett reiterates

12 that the continued detention of Package 5 violated her Fourth Amendment rights and "produced" her

13 statements, which must be suppressed as "the fruit of the unconstitutional seizure." Docket No. 72

14 at 3.

15       The Court notes that Defendant Peskett cites no case law in support of her request to suppress

16 her statements and the Court could locate none on point. No allegation has been made that

17 Defendant Peskett was in custody or subject to interrogation at the time she made her statements, so

18 *Miranda v. Arizona*, 384 U.S. 436 (1966), clearly does not apply. Further, the Court has found above

19 that the postal inspector had a reasonable and articulable suspicion sufficient to detain Package 5;

20 therefore, the statements were not made in relation to an illegal detention and are not fruit of such

21 detention or seizure. As noted by the United States, the items seized were authorized by the search

22 warrant for Package 5 and it, therefore does not matter whether currency is contraband.

23       The circumstances surrounding the statements appear to the Court as if Defendant Peskett

24 voluntarily called the post office and PI Carbonetti and voluntarily made the statements at issue in

25 her attempts to locate Package 5. The Court can fathom no reason why suppression of these

26 statements would be appropriate. Therefore, the Court recommends **DENYING** Defendant Peskett's

27 request to suppress her statements.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ORDER

Based on the foregoing and good cause appearing therefore,

IT IS HEREBY ORDERED that Defendant Peskett's request for a *Franks* hearing is **DENIED**.

## RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendants' Motions to Suppress, Docket Nos. 57 and 61, be **DENIED** in their entirety.

## NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 26th day of August, 2015.

NANCY J. KOPPE
United States Magistrate Judge

- 33 -